UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

REGINALD LEE GAIL,                          CIVIL NO. 08-404 (JMR/JSM)

      Petitioner,

v.                                          **REPORT AND RECOMMENDATION**

LYNN M. DINGLE, Warden,

      Respondent.

_____

This matter is before the undersigned United States Magistrate Judge on Reginald Lee Gail's Petition for Habeas Corpus by a Person in State Custody [Docket No. 1] and Motion to Have Civil No. 08-404 Chronology Reported [Docket No. 27]. The case has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

I.      **PROCEDURAL BACKGROUND**

On November 20, 2004, a jury convicted Petitioner of first degree intentional murder of Yvain Braziel ("Braziel") while committing or attempting to commit an unlawful sale of a controlled substance. Petitioner was sentenced to the term of life imprisonment.

On April 9, 2007, Petitioner filed a federal habeas corpus petition alleging four grounds for relief. See Civil No. 07-1815 (JMR/JSM) [Docket No. 1]. This petition was summarily dismissed for failure to exhaust state court remedies because one of the four claims – ineffective assistance of trial and appellate counsel – was then on appeal to the Minnesota Court of Appeals. See Order dated May 24, 2007 (Adopting Report and Recommendation dated April 12, 2007) [Civil No. 07-1815 (JMR/JSM), Docket No. 7].

On February 15, 2008, Petitioner filed the instant habeas corpus petition, which

listed the following grounds for relief:

(1)     The jury selection procedures in use at the time of the Petitioner's indictment, namely the prospective juror qualification form/questionnaire embodied a race factor in its official formal composition;

(2)     The trial and appellate counsel were ineffective because neither counsel informed Petitioner of his constitutional right with respect to the composition of the Hennepin County grand jury that indicted him;

(3)     Constitutional secrecy and restraint prohibit prosecutors from engaging in conduct that undercut the independence of the grand jury, including identifying the Petitioner as the "shooter" on numerous occasions to the grand jury,  and render all grand jury proceedings unconstitutional;

(4)     The trial court committed reversible error by issuing instructions to the jury requiring unanimity in their verdict without instructions as to the third verdict;

(5)     The trial court committed reversible error for failing to suppress evidence seized from an apartment where Petitioner was arrested ten days after his offense;

(6)     The trial court committed reversible error in failing to include an accomplice corroboration instruction in the final jury charge on the issue of an accomplice's testimony;

(7)     The trial court committed reversible error by not suppressing Petitioner's cellular phone records and all evidence received from those records.

(8)     The trial court committed reversible error in ordering the jury sequestered during deliberations and by causing the jury undue hardship by deliberating on a weekend holiday.

(9)     The evidence submitted at trial was insufficient as a matter of law to sustain his conviction for first degree intentional murder while committing or attempting to commit the unlawful sale of a controlled substance;

(10)   The trial court committed plain error when it instructed the jury on circumstantial evidence but failed to include the additional requirement that the circumstances proved must be consistent with the hypothesis of guilt and inconsistent with any rational hypothesis except for guilt;

(11)   The prosecutor committed misconduct by introducing character evidence solely to prove guilt;

(12)   The prosecutor committed misconduct by stating her personal opinion during closing arguments in order to bolster the credibility of a state witness; and

(13)   The trial and appellate counsels were ineffective in failing to make proper objections with regards to the previously mentioned errors, which denied his ability to raise the issue on direct appeal.

Petition at 7-19.

On November 14, 2008, the Court concluded that Petitioner was not entitled to pursue a writ of habeas corpus on Grounds 3, 4, 10 and 11, along with Grounds 2 and 13 as they related to ineffective assistance of trial counsel, because the Minnesota Supreme Court held that those claims were procedurally barred pursuant Minnesota state law. See November 14, 2008 Report and Recommendation [Docket No. 14]. The Court also concluded that Grounds 1, 5-9 and 12, and Grounds 2 and 13 as they related to ineffective assistance of appellate counsel, had been properly exhausted, and therefore, could be considered by the Court. Id. The Court then ordered Respondents to respond to the substance of Grounds 1, 5-9 and 12, and Grounds 2 and 13 as they related to ineffective assistance of appellate counsel, and to provide the Court, consistent with Rule 5 of the Rules Governing § 2254 Cases in the United States District Courts the following: the available pretrial, trial and post-conviction transcripts; all briefs submitted to the state district court by the parties; all orders issued by the state district court; all briefs submitted by the parties in any post-conviction proceedings; all

3

orders issued by a court resulting from post-conviction proceedings; and all briefs submitted by the parties to the Minnesota appellate courts, that bear on these claims.[1] Id. Respondents have now done so, and the Court will address the merits of the claims.

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs a federal court's review of habeas corpus petitions filed by state prisoners.  Section 2254 of the AEDPA provides that a district court will entertain a petition for writ of habeas corpus submitted by a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

In addition, 28 U.S.C. § 2254 provides that a habeas corpus petition:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Here, while Petitioner does not explicitly state whether he was proceeding under 28 U.S.C. § 2254(d)(1) or (2), it is evident from the substance of his Petition that he is raising challenges under both § 2254(d)(1) and (2).

---

[1]    United States District Judge James R. Rosenbaum, subsequently adopted this Court's Report and Recommendation.  See December 22, 2008 Order [Docket No 16].

The Court of Appeals for the Eighth Circuit has described the review under §

2254(d)(1) as follows:

> A decision is "contrary to" federal law "if the state court
> arrives at a conclusion opposite to that reached by [the
> Supreme] Court on a question of law" or if it "confront[ed]
> facts that are materially indistinguishable from a relevant
> Supreme Court precedent" but arrived at an opposite result.
> Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146
> L.Ed.2d 389 (2000). A state court "unreasonably applies"
> federal law when it "identifies the correct governing legal rule
> from [the Supreme] Court's cases but unreasonably applies
> it to the facts of the particular state prisoner's case," or
> "unreasonably extends a legal principle from our precedent
> to a new context where it should not apply or unreasonably
> refuses to extend that principle to a new context where it
> should apply." Id. at 407.
>
> A federal court may not issue the writ simply because it
> "concludes in its independent judgment that the relevant
> state-court decision applied clearly established federal law
> erroneously or incorrectly. Rather, that application must also
> be unreasonable." Id. at 411.

Engesser v. Dooley, 457 F.3d 731, 735-36 (8th Cir. 2006). Under this standard, the

federal court "must deny a writ – even if we disagree with the state court's decision – so

long as that decision is reasonable in view of all the circumstances." May v. Iowa, 251

F.3d 713, 716 (8th Cir. 2001) (citing Williams, 529 U.S. at 409-13).

By its terms, it is important to remember that § 2254(d)(1) "limits the benchmark

precedent against which a habeas court may measure a state court decision to 'clearly

established Federal law, as determined by the Supreme Court of the United States.'"

O'Brien v. Dubois, 145 F.3d 16, 20 (1st Cir. 1999), *overruled on other grounds*. Thus,

even if lower federal court decisions support Petitioner's position, "the writ cannot issue

unless the state court decision contravenes, or involves an unreasonable application of,

extant Supreme Court jurisprudence." Id. Nevertheless, "[t]o the extent that 'inferior'

federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness of the state court's resolution of the disputed issue." Atley v. Ault, 191 F.3d 865, 872 (8th Cir. 1999) (citing O'Brien, 145 F.3d at 25) ("If no Supreme Court precedent is dispositive of a petitioner's claim, then, a fortiori, there is no specific rule to which the state court's decision can be 'contrary.' In such circumstances, a federal habeas court then determines whether the state court decision reflects an unreasonable application of clearly established Supreme Court jurisprudence.  This reduces to a question of whether the state court's derivation of a case-specific rule from the Court's generally relevant jurisprudence appears objectively reasonable. To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness vel non of the state court's treatment of the contested issue.").

Under § 2254(d)(2), a state court decision involves "an unreasonable determination of the facts in light of the evidence presented in state court proceedings," only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record.  28 U.S.C. § 2254(e)(1).  Pursuant to § 2254(e)(1):

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

With these standards of review in mind, this Court now turns to Grounds 1, 2, 5-9 12, and 13 of the Petition.

III.     **DISCUSSION**

A.     **Ground One: Racial Composition of the Jury**

Ground 1 of the Petition provides "[t]he jury selection procedures in use at the time of the Petitioner's indictment, namely the prospective juror qualification form/questionnaire embodied a race factor in its official formal composition."[2]   The supporting facts in the Petition provided that prior to jury selection, Petitioner brought a motion before the trial court to call a new venire panel because only one person in the 50-person panel was African American.  See Petition at p. 7.  According to Petitioner, the Court denied the motion even though there was evidence that African Americans were underrepresented in the jury pool.  Id. at pp. 7-8; see also Appellant's Final Reply Brief ("Petitioner's Reply") [Docket No. 24].  Petitioner also noted that the only African American on the panel was excused for cause.  Id. at p. 8; Petitioner's Reply at p. 4.

A review of the record indicates that Petitioner's trial counsel made a motion before the trial court to bring up a new jury panel because the representation of African Americans in the panel was only 2% and the 2000 census from Hennepin County showed that African Americans made up 9% of the population.  Trial Court Transcript ("Tr.") 28.   Counsel also sought to discover the actual representation of African Americans in the Hennepin County jury pool so that the defense could see if

_____

[2]     This Court notes that Petitioner made no argument regarding the race factor in the prospective juror qualification form/questionnaire that was in use at the time of his indictment and that is still in use by Hennepin County.  In 2004, Hennepin County issued a questionnaire which included a race identification question.  See Francis v. Fabian, NO. CIV 08-836 DWF/AJB, --- F. Supp.2d ----, 2009 WL 3517868 at *11 (D. Minn. Oct. 23, 2009).  However, "inclusion of a question to identify race on a jury questionnaire does not render the juror selection process suspect."  Id. (citing Miles v. Dosal, NO. CIV 04-4072 (DWF/JSM), CIV. 04-4111 (DWF/JSM), CIV. 04-4133 (DWF/JSM), 2005 WL 2415973 at *2 (D. Minn. Sept. 27, 2005), aff'd, Miles v. Dosal, 221 Fed. Appx. 499 (8th Cir. 2007).

underrepresentation of African Americans was part of a systematic exclusion.  Tr. 29-30.  The trial court denied Petitioner's motion, finding:

> based on what I have heard and considered and my review of the jury questionnaires as well, I find no evidence of material departure from the requirement of law that govern the selection process here in Hennepin County. Accordingly, I am denying that motion, and we will proceed tomorrow with the selection of the jury panel.

Tr. 128.  Petitioner appealed the trial court's decision to the Minnesota Supreme Court arguing "that the district court erred when it denied his motion to empanel a different jury venire because of underrepresentation of African-Americans, and his alternative motion to discover information relating to the selection process for petit jury pools."  State v. Gail, 713 N.W.2d 851, 861 (2006).  The Minnesota Supreme Court concluded that Petitioner failed to make the necessary prima facie Sixth and Fourteenth Amendment challenges to jury selection because he failed to demonstrate that "over a significant period of time -- jury panel after jury panel, month after month -- the group of eligible jurors in question had been significantly underrepresented on the panels and that this had been the result of 'systematic exclusion.'"  Id. at 862 (citation omitted) (emphasis added).

Petitioner argued that he has the right to an unbiased jury and that the existence of racial discrimination in the selection of his jury violated his rights to equal protection.  See Petitioner's Reply at p. 3.  Petitioner asserted that a juror had indicated that at most, there were five African American prospective jurors out of 300 in the jury room, leading to a disparity between the percentage of African Americans in Hennepin County (9%) and the jury pool (1.6%), which evidenced systematic underrepresentation.  Id. at

p. 4.  Petitioner also asserted that the only African American on the jury panel was asked to be excused for cause without his consent.  Id.

The Court notes that the United States Supreme Court has held that criminal defendants are not entitled to a jury of a particular racial composition or that "juries actually chosen must mirror the community."  See Taylor v. Louisiana, 419 U.S. 522, 538 (1975).  The Supreme Court has also found that "juries must be drawn from a source fairly representative of the community."  Duren v. Missouri, 439 U.S. 357, 363 (1979) (citation omitted).  In order to make out a successful prima facie Sixth and Fourteenth Amendment challenge to the method of jury selection, Petitioner must establish the following:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Id. at 364; see also United States v. Sanchez, 156 F.3d 875, 879 (8th Cir. 1998) (quoting Duren).

With regards to the first Duren factor, African Americans constitute a "distinctive" group in the community.  See United States v. Womack, 985 F.2d 395, 397 (8th Cir.), cert. denied, 510 U.S. 902 (1993) ("[B]lacks constitute a 'distinctive' group in the Minnesota community.").  However, as to the second Duren factor, Petitioner provided the Court with no evidence of the percentage of African Americans on the venire panels for Hennepin County.  The only evidence provided to this Court is a Grand Jury Racial Composition regarding an unspecified jurisdiction.  See Appendix 2 to Petitioner's

Reply. Accordingly, the Court is unable to determine whether African Americans have not been fairly and reasonably represented on Hennepin County venire panels in relation to their presence in the community. As to the third <u>Duren</u> factor, Petitioner's jury claim is focused on the fact that the jury panel that was used to select the jury for his case was not representative of the percentage of African Americans in Hennepin County. However "[e]vidence of a discrepancy on a single venire panel cannot demonstrate systematic exclusion." <u>Singleton v. Lockhart</u>, 871 F.2d 1395, 1399 (8th Cir.), <u>cert</u>. <u>denied</u>, 493 U.S. 874 (1989); <u>see</u> <u>also</u> <u>Phea v. Benson</u>, 95 F.3d 660, 662 (8th Cir. 1996), <u>cert</u>. <u>denied</u>, 519 U.S. 976 (1996).

As such, this Court concludes that the Minnesota Supreme Court's decision regarding Petitioner's challenges to jury selection was not contrary to, or an unreasonable application of, clearly established federal law. Nor was the decision based upon an unreasonable determination of the facts. Petitioner's claim that the jury was unconstitutionally selected should be dismissed.

### B. Grounds 2 and 13: Ineffective Assistance of Appellate Counsel

Petitioner's ineffective assistance of appellate counsel claims found in Grounds 2 and 13 of the Petition, are based on: (1) appellate counsel's failure to notify Petitioner of his rights with regard to the composition of the grand jury that indicted him; (2) appellate counsel's failure to present evidence, which was available in his trial record, that would have shown that there was significant underrepresentation of African Americans in the jury pool over a long period of time, stemming from the systematic exclusion of African Americans; (3) appellate counsel's failure to raise Grounds 3, 4, 10 and 11 of his Petition on the direct appeal of his conviction, which resulted in them being procedurally

barred; and (4) appellate counsel's failure to raise an ineffective assistance of trial counsel claim on appeal, where the record contained evidence of trial counsel's failure to call ten subpoenaed witnesses, failure to use the Hennepin County Examiner's report, or failure to call an expert witness. <u>See</u> Petition at pp. 8-9, 13, 18; Petitioner's Reply at pp. 6-7, 25.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). To state a claim for ineffective assistance of counsel, Petitioner "must demonstrate that (1) 'counsel's representation fell below an objective standard of reasonableness;' and (2) 'the deficient performance prejudiced the defense.'" <u>Miller v. Dormire</u>, 310 F.3d 600, 602 (8th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at 687-88). The <u>Strickland</u> requirement of showing that counsel was unreasonably deficient and that the defense was prejudiced by this deficiency is applicable to ineffective assistance of appellate counsel claims. <u>See</u> <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000). "To satisfy the second part of the <u>Strickland</u> test, the petitioner must prove that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" <u>Garrett v. Dormire</u>, 237 F.3d 946, 950 (8th Cir. 2001) (quoting <u>Strickland</u>, 466 U.S. at 694); <u>Miller</u>, 310 F.3d at 602 (same). In ineffective assistance of counsel claims, there is a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy. <u>Strickland</u>, 466 U.S. at 689; <u>Collins v. Dormire</u>, 240 F.3d 724, 727 (8th Cir. 2001) (in determining whether counsel's performance was deficient, the court should "indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . .") (quoting <u>Strickland</u>, 466 U.S. at 689).

With regards to Petitioner's ineffective assistance of appellate counsel claims, the Minnesota Supreme Court determined:

> Appellate counsel's decision not to challenge the grand jury procedures was reasonable for the same reason that trial counsel's decision was reasonable-the claim had no merit.[3]

---

[3]    The Minnesota Supreme Court rejected Petitioner's claim that his trial counsel was ineffective, stating;

> Gail claims that his trial counsel was ineffective for failing to challenge the grand jury proceedings, for failing to raise objections at trial, and for failing to interview witnesses and fully investigate his case, claims (2) and (13). Gail's claims of ineffective assistance of trial counsel are <u>Knaffla</u>-barred because he knew or should have known of them after trial and before his direct appeal. Gail submitted a pro se brief on his direct appeal and could have included his ineffective assistance of counsel claims at that time. The claims do not fall under the exceptions to <u>Knaffla</u>.

> Even if not <u>Knaffla</u>-barred, Gail's claims of ineffective assistance of trial counsel have no merit. In order to prevail on a claim of ineffective assistance of counsel, Gail must show that his attorney's performance fell below an objective standard of reasonableness and that a reasonable probability exists that the outcome would have been different, but for counsel's errors. <u>Bruestle v. State</u>, 719 N.W.2d 698, 704 (Minn. 2006). Gail has the burden of proof and there is a strong presumption that counsel's performance fell within a wide range of reasonable assistance. <u>Id.</u> at 705.

> We rejected a claim that African-Americans are systemically excluded from grand juries and trial juries in <u>Mckenzie</u> [v. State, 707 N.W.2d [643, 645 (Minn. 2005)], where we held that because the grand jury procedures were constitutional and the issue did not fall under either <u>Knaffla</u> exception, petitioner's "ineffective assistance of counsel claim with respect to the grand jury selection process also fails." Because the claim itself has no merit, Gail's trial counsel was not ineffective for failing to raise it.

> Because Gail did not provide a factual basis for his other claims of errors by trial counsel or the district court, appellate counsel's failure to raise those issues on appeal was reasonable. Gail has failed to allege any facts that would support his assertion that his appellate counsel's representation was ineffective.

Gail, 732 N.W.2d at 249.

The Minnesota Supreme Court correctly applied the Strickland analysis to Petitioner's ineffective assistance of appellate counsel claims. First, appellate counsel's alleged failure to notify Petitioner of his rights with regards to the composition of the grand jury that indicted him did not prejudice him.[4] Petitioner has no constitutional right to a proportionate number of his race on his grand jury and was instead, only entitled to be free of the systematic exclusion of African Americas "inherent in the particular jury-selection process utilized." Duren, 439 U.S. at 366; see also United States v. Childress, 715 F.2d 1313, 1314 (8th Cir. 1983) (citing Swain v. Alabama, 380 U.S. 202, 208

---

> Gail has not provided any factual support for his other assertions of ineffective assistance of trial counsel. Gail has not provided a record of his trial counsel's failure to challenge the indictment due to prosecutorial misconduct, nor has Gail provided any factual support for his assertions that his trial counsel failed to investigate, speak with witnesses, and prepare his case. Gail is not entitled to a postconviction evidentiary hearing, because a petitioner requesting an evidentiary hearing cannot depend on mere argumentative assertions without factual support. Ferguson v. State, 645 N.W.2d 437, 446 (Minn.2002). Because Gail has not provided any facts to support his assertions that his counsel failed to investigate his case, he is not entitled to postconviction relief.

Gail, 732 N.W.2d at 248-49.

[4] The Court notes that Petitioner did not make this claim in his Petition for Post-Conviction Relief or to the Minnesota Supreme Court. See Appendix Index [Docket No. 20].

(1965)); <u>Francis</u>, 2009 WL 3517868 at *10 ("A defendant in a criminal case is not constitutionally entitled to a proportionate number of his race on his grand or petit jury. However, under the Sixth Amendment of the U.S. Constitution, the jury selection process must draw prospective jurors from a fair cross-section of the community because a criminal defendant is entitled to an impartial jury.") (citing <u>United States v. Horne</u>, 4 F.3d 579, 587 (8th Cir.), <u>cert. denied</u>, 510 U.S. 1138 (1994)) (internal citation omitted).  In other words, even if appellate counsel had notified Petitioner that there were no African Americans on the grand jury that indicted him, he would not entitled to any relief, as such evidence does not go to the issue of systematic exclusion.  In any event, Hennepin County's grand jury selection process, which uses registered voters, driver's licenses, and registered Minnesota identification card holders for a master list of registered voters, has been determined to be free of systematic exclusion.  <u>See McKenzie v. State</u>, 707 N.W.2d 643, 645 (Minn. 2005), <u>cert. denied</u>, 516 U.S. 926 (1995); <u>see also Francis</u>, 2009 WL 3517868 at *11 (citation omitted).  Petitioner has provided no evidence to the contrary.

Second, Petitioner's assertion that appellate counsel failed to present evidence that was available in his trial record that would have shown that there was significant underrepresentation of African Americans in the jury pool over a long period of time, stemming from the systematic exclusion of African Americans, is rejected because Petitioner presented no evidence to support systematic exclusion.  A conclusory allegation that appellate counsel failed to utilize available unidentified evidence is insufficient to demonstrate that appellate counsel was ineffective or that Petitioner was prejudiced.  <u>See United States v. Delgado</u>, 162 F.3d 981, 983 (8th Cir. 1998)

(concluding that naked assertions that an attorney failed to call exculpating witnesses are insufficient to show counsel was ineffective or that defendant was prejudiced).

Third, Petitioner's argument that appellate counsel was ineffective because counsel failed to raise Grounds 3, 4, 10 and 11 of his Petition, which resulted in them being procedurally barred, has no basis because these grounds lack merit.

With regards to Ground 3, Petitioner claimed that grand jury proceedings were unconstitutional, the prosecutor impermissibly referenced to him as the "shooter" during the grand jury proceedings and invited juror members to do the same, thereby undercutting the independence of the jury. <u>See</u> Petition at pp. 9-10.

"Grand jury proceedings are constitutionally mandated for the institution of federal criminal prosecutions for capital or other serious crimes, and 'its constitutional prerogatives are rooted in long centuries of Anglo-American history.'" <u>Branzburg v. Hayes</u>, 408 U.S. 665, 687 (1972) (quoting <u>Hannah v. Larche</u>, 363 U.S. 420, 489-490 (1960) (Frankfurter, J., concurring in result)). Indeed, the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. The use of the grand jury "in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice." <u>Costello v. United States</u>, 350 U.S. 359, 362 (1956).

Having articulated no reasons why the grand jury process is unconstitutional, except to say that it is unconstitutional (<u>see</u> Petition at p. 9), Petitioner cannot prevail on such a claim. Counsel's failure to raise this issue on appeal did not fall below the objective standard of reasonableness and caused Petitioner no prejudice.

As for Petitioner's claim that the prosecutor impermissibly referenced to him as the "shooter" during the grand jury proceedings and invited juror members to do the same, the guilty verdict against by the petit jury "means not only that there was probable cause to believe that the defendant[] [was] guilty as charged, but also that [he was] in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." United States v. Mechanik, 475 U.S. 66, 70 (1986); see also United States v. Adams, 401 F.3d 886, 900 (8th Cir. 2005) ("[E]ven if we were to assume there was prosecutorial misconduct during the grand jury proceedings, the petit jury's guilty verdict rendered those errors harmless." (quotation omitted)). Consequently, any alleged misconduct by the prosecutor during the grand jury process did not harm Petitioner given that he was found guilty beyond a reasonable doubt by a petit jury. As such, appellate counsel's failure to raise this issue on appeal was objectively reasonable and Petitioner suffered no prejudice from it.

In Ground 4, Petitioner asserted that the trial court committed reversible error by issuing instructions to the jury requiring unanimity in their verdict without instructions as to the third verdict. See Petition at p. 10. However, Petitioner does not have right to a jury instruction setting out the third alternative, that is, making no decision (hung jury). See United States. v. Skillman, 442 F.2d 542, 558 (8th Cir. 1971), cert. denied 404 U.S. 833 (1971); see also United States v. Arpan, 887 F.2d 873, 876 (8th Cir. 1989) (citation omitted) ("In this circuit, Arpan has no right to an initial instruction specifically setting out the third alternative, that is, making no decision."). The trial court's failure to instruct the jury on the third alternative was not contrary to clearly established Federal law, as

determined by the Supreme Court of the United States. Therefore, this Court finds that appellate counsel's failure to raise this issue on appeal was objectively reasonable and caused Petitioner no prejudice.

In Ground 10, Petitioner took the position that the trial court committed plain error when it instructed the jury on circumstantial evidence but failed to include the additional requirement that the circumstances proved must be consistent with the hypothesis of guilt and inconsistent with any rational hypothesis except for guilt. This claim is without merit. Under federal law, a defendant is not entitled to an instruction that circumstantial evidence must exclude every reasonable hypothesis other than guilt, when a reasonable doubt instruction is given. See Holland v. United States, 348 U.S. 121, 139-40 (1954) ("The petitioners assail the refusal of the trial judge to instruct that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt[,] but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect.") (citations omitted).

Here, the trial court gave the following instruction:

> Direct and circumstantial evidence. A fact may be proved by either direct or circumstantial evidence or both. The law does not prefer one form of evidence over the other. A fact is proven by direct evidence when, for example it is provided by a witness who testified to what they saw, heard, or experienced, or by physical evidence of the fact itself.
>
> A fact is proved by circumstantial evidence when its existence can be reasonably inferred from other facts proved in the case. Whatever the nature of the evidence you consider, you must find the evidence proved each element of the offense beyond a reasonable doubt in order for you to find the defendant guilty of that offense.

17

Tr. 1162-63 (emphasis added). The trial court provided the instruction that regardless of the nature of the evidence, the jury was required to find the evidence proved each element of the offense beyond a reasonable doubt in order for it to find Petitioner guilty of the charged offense, and also instructed the jury on proof beyond a reasonable doubt. Tr. 1162. The trial court's failure to provide Petitioner's desired instruction on circumstantial evidence is neither contrary to nor an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. Therefore, appellate counsel's failure to raise this issue on appeal was objectively reasonable and Petitioner suffered no prejudice from it.

With regards to Ground 11, as best as this Court can discern, Petitioner is challenging the prosecutor's reference to him during his trial as the "shooter," as violating his right to only be convicted based on evidence and whether it indirectly commented on his failure to testify at trial. See Petition at pp. 17-18 (citing Tr. 279-80, 1082, 1087, 1101, 1108, 1110). The reference of a "shooter" at Tr. 279-80 was made by a witness and cannot be attributed to the prosecutor. Similarly, the reference of a "shooter" at Tr. 1108 and 1110 was made by defense counsel. The remainder of the references to a "shooter" were made by the prosecution during closing arguments, where she referenced testimony by a witness that Petitioner was the "shooter" (Tr. 1082, 1087, 1101) and documentary evidence supporting a finding that defendant was the shooter (Tr. 1087).

"'A prosecutor must limit the closing argument to the evidence and the reasonable inferences that may be drawn from it.'" United States v. Hawkins, 548 F.3d 1143, 1147 (8th Cir.), cert. denied 129 S.Ct. 2757 (2009) (quoting United States v.

Eagle, 515 F.3d 794, 805 (8th Cir. 2008)). There was no error in referring to defendant as the "shooter", nor was there any objection made by the defense during closing arguments. In any event, that was the charge against Petitioner in this case, and the evidence supported the prosecutor's assertion. In particular, Hollingsworth testified that Petitioner was the shooter. Tr. 295-97. Appellate counsel's failure to raise the prosecution's referral to defendant as the "shooter" during closing arguments, given that such references were supported by the available evidence, was objectively reasonable and Petitioner was not prejudiced.

In sum, none of the claims that Petitioner claimed should have been raised by appellate counsel would have yielded a different result on his appeal.

Finally, Petitioner pointed to appellate counsel's failure to raise an ineffective assistance of trial counsel claim on appeal where the record contained evidence of the trial counsel's failure to call ten subpoenaed witnesses, use the Hennepin County Examiner's report, or call an expert witness. See Petition at p. 19; Petitioner's Reply at p. 25. Petitioner's failure to provide how the subpoenaed witnesses would have testified, identify the expert witness and how he or she would have testified, and why such additional evidence, including the use of the Hennepin County Examiner's report, would likely have affected the result of his trial, is fatal to his ineffective appellate counsel claim. See Delgado, 162 F.3d at 983; see also Smith v. Roehrich, NO. CIV. 08-6113 (RHK/JJK), 2009 WL 3615022 at *7 (D. Minn. Oct. 27, 2009) ("Petitioner's assertion that his trial counsel failed to call expert witnesses fails for the same reason that his assertions regarding other defense witnesses fail; specifically, Petitioner has not identified who the expert witnesses are who allegedly should have been called to testify,

what their testimony would have been, and how that testimony would have benefited Petitioner's defense.") (citation omitted).

The Court has reviewed the relevant portions of the trial transcript, and finds that the Minnesota Supreme Court both reasonably applied federal law and reasonably determined the facts in light of the evidence presented by Petitioner, when it concluded that if appellate counsel had addressed Petitioner's claims, the result of the trial likely would not have been different. Petitioner's ineffective assistance of appellate counsel claims should be dismissed.

### C. Ground Five: Motion to Suppress Evidence from Apartment

According to the Petition, "[t]he trial court committed reversible error for failing to suppress evidence seized from an apartment where Petitioner was arrested ten days after his offense." See Petition at p. 11. Petitioner argued that the search pursuant to search warrant, which yielded a firearm in an apartment lacked probable cause, as the search took place ten days after the crime, Petitioner did not reside in the apartment, and the apartment was not in close proximity to the scene of the crime. See Petitioner's Reply at p. 13. The Minnesota Supreme Court concluded that the warrant application provided information that Petitioner had been identified by a witness as the shooter, and had sufficiently tied Petitioner to the apartment where Petitioner had contacted his probation officer using the telephone in this residence, Petitioner remained at the apartment long enough for the probation officer to call the police, for the police to locate the address of the apartment, and for the police to travel to the apartment and find Petitioner there. Gail, 713 N.W.2d at 859.

The Court finds that Petitioner's Fourth Amendment claim is not properly before this Court. Fourth Amendment claims are not cognizable in federal habeas proceedings if the state provided the petitioner an opportunity for the full and fair litigation of such claims. See Stone v. Powell, 428 U.S. 465, 494 (1976); see also Palmer v. Clarke, 408 F.3d 423, 437 (8th Cir. 2005) (same) (citation omitted). "The Eighth Circuit uses a two-part test to determine if a full and fair opportunity to litigate a claim has been provided." Wilson v. State, No. Civ. 00-1194 (JRT/JGL), 2002 WL 1752208 at *2 (D. Minn. July 29, 2002) (citing Willett v. Lockhart, 37 F.3d 1265 (8th Cir. 1994)). In this regard, "a Fourth Amendment habeas corpus claim is barred by Stone v. Powell unless: 1) 'the state provided no procedure by which the prisoner could raise his Fourth Amendment claim' or 2) 'the prisoner was foreclosed from using that procedure because of an unconscionable breakdown in the system.'" Wilson, 2002 WL 1752208 at *2 (quoting Willett, 37 F.3d at 1273). As to the first part of this test, the Eighth Circuit has stated that it finds "petitioner's 'opportunity' for full and fair litigation should not depend upon whether he has taken advantage of the process available. . . ." Willett, 37 F.3d at 1271. Further, "[t]he federal courts on habeas review of such claims are not to consider whether full and fair litigation of the claims in fact occurred in the state courts, but only whether the state provided an opportunity for such litigation." Id. at 1273.

In this case, Petitioner argued in his Petition that he was not allowed to take the stand or confront the source from which the evidence was received. See Petition at p. 11. This Court finds Petitioner's assertion to be without basis. Petitioner had an opportunity, through an omnibus hearing at the state trial court level, to address his argument that the search of the apartment was unconstitutional. His counsel was able

21

to cross-examine all of the witnesses provided by the state in relation to his motion to suppress and was given the opportunity by the trial court to present witnesses, however, Petitioner did not take the stand.  Tr. 36-116.  In addition, Petitioner, through his counsel presented arguments in support of his motions to suppress.  Tr. 109-16.  The trial court issued an Order deciding Petitioner's motion, ruling that the entry and search of the Apartment did not violate the Fourth Amendment.  Tr. 121-22.  Further, Petitioner raised this claim in his appeal to the Minnesota Supreme Court for review of the trial court's decision.  See Gail, 713 N.W.2d at 859.  There is nothing before this Court to suggest that Petitioner was foreclosed from using any procedure available to him at the state court level to raise his Fourth Amendment claim arising out the seizure of evidence from the apartment, much less because of an unconscionable breakdown in the system.  Therefore, this Court finds that Petitioner is not entitled to relief on this ground.

### D.    Ground Six: Accomplice Corroboration Jury Instruction

In his sixth ground for relief, Petitioner argued that "[t]he trial court committed reversible error in failing to include an accomplice corroboration instruction in the final jury charge on the issue of an accomplice's testimony."  See Petition at p. 12.  The Minnesota Supreme Court noted that under Minn. Stat. § 634.04 and state case law, trial courts have a duty to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice.  See Gail, 713 N.W.2d at 863-64 (citations omitted).  With regards to the two alleged accomplices, the Minnesota Supreme Court concluded that one of the witnesses did not qualify as an accomplice; it did not decide whether the second

witness was an "accomplice in the murder or that it was error for the district court not to allow the jury to decide the question because [it] conclude[d] that any error in not submitting the accomplice issue to the jury was harmless on this record." Id. at 864.

"Federal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 67 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, law or treaties of the United States." Id. at 67-68. Along this line, "state laws requiring corroboration do not implicate constitutional concerns that can be addressed on habeas review." Harrington v. Nix, 983 F.2d 872, 874 (8th Cir. 1993) (citing Redding v. Minnesota, 881 F.2d 575, 578 (8th Cir. 1989), cert. denied, 493 U.S. 1089 (1990); Gipson v. Lockhart, 692 F.2d 66, 68 (8th Cir. 1982)). Nor is there any "constitutional requirement that accomplice testimony be corroborated." Id. (citing DuBois v. Lockhart, 859 F.2d 1314, 1317 (8th Cir. 1988)). Any failure by the state district court to provide an accomplice corroboration instruction in the final jury charge pursuant to state law did not implicate any constitutional right. Petitioner's sixth ground for relief should be dismissed.

### E.     Ground Seven: Motion to Suppress Cellular Phone Records

Petitioner's seventh ground for relief was that "[t]he trial court committed reversible error by not suppressing Petitioner's cellular phone records and all evidence received from those records." See Petition at p. 13. Petitioner argued that the administrative subpoena to obtain his cellular phone records, to which he claimed he had a subjective expectation of privacy, was not an acceptable substitute to a judicially

obtained search warrant under the Fourth Amendment.  <u>Id.</u>  It is Petitioner's position

that the seizure of the telephone records violated his Fourth Amendment rights.  <u>See</u>

Petitioner's Reply at p. 9.  The trial court denied Petitioner's motion on the basis that

Petitioner did not have a legitimate expectation of privacy in his voluntary conveyance of

numbers that are dialed or coming into a third party, that being the telephone company.

Tr. 122-23.  The Minnesota Supreme Court affirmed the decision of the trial court,

noting that Petitioner did not have a subjective expectation in privacy in the cellular

phone records as he was:

> three steps removed from Verizon and the records it
> produced via the company's "lease" to Larkins, Larkins's
> "sub-lease" to Davis, and Davis's "sub-sub-lease" to Gail.
> Moreover, Davis, not Gail, received the bills for the usage of
> the cell phone from Verizon, and Davis, not Gail, paid these
> bills. Because two other people stood between Gail and
> Verizon, and Gail did not testify or call any witnesses to
> support a finding that he had an expectation of privacy in the
> records, we cannot conclude on this record that Gail
> subjectively expected Verizon to keep records of his cell
> phone usage private.

<u>Gail</u>, 713 N.W.2d at 860.

This Court finds that Petitioner's Fourth Amendment claim is not properly before

this Court, as Fourth Amendment claims are not cognizable in federal habeas

proceedings.  <u>See</u> Report and Recommendation, <u>supra</u> Section III.C.[5]

---

[5]    Even if Petitioner could raise such issues in this case, his arguments would fail,
as the conclusions of the trial court and the Minnesota Supreme Court that Petitioner's
motion to suppress that he lacked a legitimate expectation of privacy in the numbers he
dialed or received, was neither contrary to or a misapplication of federal law, nor is it an
unreasonable determination of the facts.  The United States Supreme Court has held
that "'capacity to claim the protection of the Fourth Amendment depends . . . upon
whether the person who claims the protection of the Amendment has a legitimate
expectation of privacy in the invaded place.'   A subjective expectation of privacy is
legitimate if it is 'one that society is prepared to recognize as 'reasonable.'"  <u>Minnesota</u>

v. Olson, 495 U.S. 91, 95-6 (1990) (citing Rakas v. Illinois, 439 U.S. 128, 143-44 (1978); Katz v. United States, 389 U.S. 347, 361 (1967)).  In Smith v. Maryland, 442 U.S. 735 (1979), the United States Supreme Court ruled in response to a motion to suppress a pen register recording telephone numbers called by the petitioner's home telephone, that the petitioner did not have a subjective expectation of privacy in the telephone numbers dialed:

> Telephone users . . . typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes. Although subjective expectations cannot be scientifically gauged, it is too much to believe that the telephone subscribers, under these circumstances, harbor any general expectation that the numbers they dial will remain secret.

442 U.S. at 743.

Moreover, the Supreme Court has found that even if the petitioner did have some subjective expectation that the telephone numbers he dialed would remain private, it was not a reasonable expectation since:

> a person has no legitimate expectation of privacy in information he voluntarily turns over to third persons. . . . When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and "exposed" that information to its equipment in the ordinary course of business. In so doing, petitioner assumed the risk that the company would reveal to police the numbers he dialed. The switching equipment that processed those numbers is merely the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber.

Id. at 743-44.

In this case, the subjective expectation of privacy is even more tenuous than that in Smith, as the Verizon cellular phone bill was received by and paid for by another person.  Not only did Verizon obtain the records of the calls made and received for billing purposes, but a separate individual other than Petitioner received this information.  In short, Petitioner could not have expected that the cellular phone records would remain private when he allowed others to view this information.  In addition, the Court concludes, pursuant to Smith, that Petitioner had no reasonable expectation in privacy when he exposed the calls he made and received to Verizon for the business

## F.    Ground Eight: Sequestration of Jury

In the eighth ground for relief, Petitioner argued that the trial court committed reversible error in ordering the jury sequestered during deliberations and by causing the jury undue hardship by deliberating on a weekend holiday.  See Petition at p. 14. According to Petitioner, the evidentiary portion of his trial ended "on the Thursday before Thanksgiving."  Id.  The State had requested that the jury be sequestered during deliberations.  Tr. 1026.  Petitioner requested that the Court inquire of the jury whether it wanted to start the deliberations on Friday, with the prospect of having to deliberate over the weekend, or start on Monday with the prospect of the upcoming Thanksgiving Day holiday.  Id.  Petitioner asked that the trial judge to follow whatever the jury wanted as to when to start deliberations.  Id.  The trial court denied this request stating that asking the jury when it wanted to start deliberations was fraught with dangers including the possibility that some jurors might desire to start deliberations on Friday, while other jurors might desire to start on a Monday, and could have constituted a suggestion to the jury on how fast they should deliberate.  Tr. 1028-29.  The court found that the better course was to tell jurors when they were going to deliberate.  Tr. 1029.

Petitioner also challenged the constitutionality of Rule 26.03 of the Minnesota Rules of Criminal Procedure.[6]  Tr. 1029-31.  Petitioner asserted to the trial court that this

_____

purpose of tolling the calls.  Tr. 78-79.  As such, the warrantless inspection, using an administrative subpoena, of the Verizon cellular phone records did not violate Petitioner's Fourth Amendment rights.

[6]    Rule 26.03 provides in relevant part:

Subd. 5. Sequestration of the Jury.

(1) In the Discretion of the Court. During the period from the time the jurors are sworn until they retire for deliberation

impaired his right to a fair trial.  Id.  The trial court denied the motion to the extent that

Petitioner was challenging the constitutionality of the Rule and ordered the

sequestration of the jury, noting that there had been a call made by the media regarding

when the closing argument was going to take place.  Tr. 1033-34.  The Minnesota

Supreme Court rejected Petitioner's constitutional challenge to Rule 26.03 and held that

the district court did not abuse its discretion by denying Petitioner's motion to ask the

jurors about their preference as to the timing for the commencement of deliberations.

See Gail, 713 N.W.2d at 865.

Petitioner has challenged the constitutionality of Rule 26.03.  Additionally, it is his

position that submitting his case to the jury on a Friday afternoon before an upcoming

holiday, without first asking the jury's preference, and sequestering the jury, amounted

---

upon their verdict, the court, in its discretion, may either
permit them and any alternate jurors to separate during
recesses and adjournments or direct that they be
continuously kept together during such period under the
supervision of proper officers. With the consent of the
defendant and the prosecution, the court, in its discretion,
may allow the jurors to separate over night during
deliberation. The officers shall not speak to or communicate
with any juror concerning any subject connected with the trial
nor permit any other person to do so, and shall return the
jury to the courtroom at the next designated trial session.

(2) On Motion. Either party may move for sequestration of
the jury at the beginning of trial or at any time during the
course of the trial. Sequestration shall be ordered if it is
determined that the case is of such notoriety or the issues
are of such a nature that, in the absence of sequestration,
highly prejudicial matters are likely to come to the attention
of the jurors. Whenever sequestration is ordered, the court in
advising the jury of the decision shall not disclose which
party requested sequestration.

to coercing the jury to come back with a verdict quickly.  <u>See</u> Petition at pp. 14-15; Petitioner's Reply at pp. 14-15.

Sequestering juries under the federal trial system is a matter of sound judicial discretion.  <u>See</u> <u>Holt v. United States</u>, 218 U.S. 245, 249 (1910).  On the one hand, it is possible for security measures employed during a trial to be so "inherently prejudicial" that they deprive a defendant of the right to an impartial jury.  <u>See</u> <u>Holbrook v. Flynn</u>, 475 U.S. 560, 570 (1986).  On the other hand, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation. . . .  [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982).  Contrary to Petitioner's assertion, sequestration of a jury does not, in of itself, deprive a defendant of the right to an impartial jury.

Further, the Minnesota Supreme Court's affirmation of the trial court's rejection of Petitioner's request that the trial court ask the jury regarding its preferences on when it wanted to start the deliberations is not contrary to, or an unreasonable application of, the decisions of the Supreme Court.  Further, the trial court's findings are entitled to a presumption of correctness unless rebutted by the Petitioner with clear and convincing evidence.  <u>See</u> 28 U.S.C. § 2254(e)(1).  Here, Petitioner has failed to provide any evidence to rebut the finding that asking jurors when they wanted to start deliberations

denied him a fair trial. For these reasons, Ground Eight of the Petition should be dismissed.

### G.     Ground Nine: Sufficiency of Evidence

In Ground Nine, Petitioner alleged that the evidence submitted at trial was insufficient as a matter of law to sustain his conviction for first degree intentional murder while committing or attempting to commit the unlawful sale of a controlled substance. See Petition at p. 15. In particular, Petitioner asserted that "he was never linked to any gun or with the sell [sic] of any controlled substances. Therefore could not have been convicted of the crimes charged with." Id. In his reply memorandum, Petitioner again reiterated that his right to due process was violated, as the evidence showed that he was not the one selling the drugs that was the motive of the crime. See Petitioner's Reply at pp. 15-16. In addition, Petitioner argued that there was no evidence presented that demonstrated that he was the shooter, given that there were no gun shell casings found at the murder site, no gun was seen at the time of the shooting, law enforcement failed to pursue a connection with De-Andre Hill and the murder; and that although a firearm was found in the home where Petitioner had been arrested, there was no proof provided that the firearm belonged to him. Id. at pp. 17-18.

According to the United States Supreme Court, the critical inquiry in reviewing the sufficiency of the evidence for a criminal conviction is:

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime beyond a
reasonable doubt.

Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (quoting Woodby v. INS, 385 U.S.

276, 282 (1966)) (emphasis in original).

Consistent with this articulation of the Court's role in a habeas case by the

Supreme Court, the Eighth Circuit has described the standard of review of insufficiency

of the evidence claims as follows:

> Our standard of review is as narrow as it is well-established:
> This court must view the evidence in the light most favorable
> to the government and sustain the verdict if it is supported by
> substantial evidence. Moreover, on appeal, the government
> must be given the benefit of all inferences that may logically
> be drawn from the evidence. It is not necessary that the
> evidence exclude every reasonable hypothesis except guilt;
> instead, the evidence is simply sufficient if it will convince a
> trier of fact beyond a reasonable doubt that the defendant is
> guilty. This court will not disturb a conviction if evidence
> rationally supports two conflicting hypotheses. Each of the
> elements of the crime charged may be proven by
> circumstantial evidence, as well as by direct evidence. And
> finally, this court must keep in mind that the standard to be
> applied to determine the sufficiency of the evidence is a strict
> one, and the finding of guilt should not be overturned lightly.

Hill v. Norris, 96 F.3d 1085, 1088 (8th Cir. 1996) (quoting United States v. Brown, 921

F.2d 785, 791 (8th Cir. 1990)). "Our function as an appellate court is not to re-weigh the

evidence. To the contrary, we must accord 'great deference' where a state appellate

court has found the evidence supporting the conviction constitutionally sufficient," as is

the case here. Id. (citations omitted); see also Blair-Bey v. Nix, 44 F.3d 711, 713 (8th

Cir. 1995) (finding that, in evaluating claims that the evidence was insufficient to find

guilt, courts must examine "whether, after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt"); <u>Redding v. State</u>, 881 F.2d 575, 578 (8th Cir. 1989) (holding that in "evaluating sufficiency of the evidence in habeas corpus petitions, we view the evidence in the light most favorable to the prosecution and determine 'whether <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'") (citations omitted) (emphasis in original).

Minnesota law regarding murder in the first degree provides in relevant part:

> (a) Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:
>
> * * *
>
> (3) causes the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit . . . any felony violation of chapter 152 involving the unlawful sale of a controlled substance.

Minn. Stat. § 609.185(a)(3).

The conclusion of the Minnesota Supreme Court was that viewing the evidence in the light most favorable to the verdict, the evidence presented at trial was sufficient to support the conviction for murder in the first degree while committing or attempting to commit the unlawful sale of a controlled substance based on the following evidence:

> Hollingsworth testified that Braziel came to Minneapolis to buy $250 worth of cocaine from Gail. While Hollingsworth and Braziel were driving around Minneapolis with Gail, and after Gail received a cell phone call, Gail told Braziel "what the price was going to be"-$250. Gail then directed Braziel to drive to a four-door, red Dodge Neon where two men were waiting. Gail told Braziel to follow the Neon. Gail later told Braziel to get into the Neon, and after some reluctance, Braziel got in the Neon with Gail and the other two men to complete the deal. Hill testified that, after Gail and Braziel got into the car, "they just started to make the deal." Hill testified that Braziel started arguing with Gail that he wanted

his money back because the cocaine was "short" and Braziel and Gail started fighting.

Hollingsworth testified that he saw Gail shoot Braziel numerous times after he saw a struggle in the Neon. Hollingsworth's description of Gail's clothing matched the description given by A.L., who saw someone in a "bulky, dark coat" fire multiple shots down toward the ground from outside of the passenger side of the Neon. Finally, the medical examiner testified that Braziel died from multiple gunshot wounds and the manner of death was homicide.

Gail, 713 N.W.2d at 862-63.

Andre Hollingsworth ("Hollingsworth") testified that he and Braziel came to Twin Cities to purchase powder cocaine, but did not know who they were meeting. Tr. 269-70. Braziel made a call on his cell phone to ask where to meet the seller. Tr. 271-72. At the meeting place, an individual wearing a casual button up shirt, a black "puffy" down jacket, a black hat, boots and blue jeans, got into the vehicle with Braziel and Hollingsworth. Tr. 272-73, 404. Hollingsworth identified the individual who got into the car as Petitioner. Tr. 273. DNA recovered from a bottle located in Braziel and Hollingsworth's vehicle belonged to Petitioner. Tr. 627-30, 866. Petitioner proceeded to sell marijuana to Braziel. Tr. 274. Petitioner then received a telephone call on his cellular phone and told Hollingsworth and Braziel that the caller was "my guy" and told Braziel what the price was going to be for the cocaine. Tr. 277.

Petitioner directed Braziel to a house in Minneapolis and had Braziel park behind a red vehicle – the driver was a male wearing a grey hooded sweatshirt and the passenger was a male wearing a brown Carhartt jacket. Tr. 278-79. Petitioner went to speak with the occupants of the red vehicle and came back and told Braziel to follow the red vehicle. Tr. 281. After arriving at another house, Petitioner told Braziel and

Hollingsworth that the man in the Carhartt jacket could not get into the house to get the "stash," but that Petitioner had another "stash" elsewhere. Tr. 283. Petitioner told Braziel and Hollingsworth to follow the red vehicle; Petitioner got into the red vehicle which drove to an apartment complex, where Petitioner and the man in the Carhartt jacket went into the complex, came out and then told Braziel to follow them to a side street facing a park. Tr. 284-85. Hollingsworth testified that he never saw any drugs. Tr. 371.

At the insistence of the man in the Carhartt jacket, Braziel got into the back right passenger seat of the red vehicle; Petitioner, was in the front passenger seat. Tr. 289, 373. The man in the Carhartt jacket was next to Petitioner in the backseat and the man in the grey hooded sweatshirt was driving the vehicle. Tr. 289-90. Hollingsworth stated that after Braziel got into the red vehicle, it took off and Hollingsworth drove after them. Tr. 290. Hollingsworth observed movement in the vehicle like there was a struggle going on. Id.

The red vehicle stopped and Hollingsworth observed Petitioner get out of the car and stand approximately six feet in front of the window of the back passenger seat. Tr. 292-93. Braziel then tried to get into the front seat of the vehicle. Tr. 294. Hollingsworth heard Petitioner say "that's my guy, just let him go and also stating "why you'all doing that to him." Tr. 382. Hollingsworth stated that after he told a passerby to call the police, he saw Petitioner shoot Braziel six or seven times. Tr. 295-97, 410. Although it was dark, Hollingsworth testified that he could see that Petitioner with a "black" gun and that he also saw the muzzle flash when Petitioner shot Braziel. Tr. 297, 394, 396, 408-09. Hollingsworth stated that a street light and the light from the

surrounding houses allowed him to see what was going on.  Tr. 299.  Hollingsworth was approximately a car's length away when the shooting first started.[7]  Tr. 299.

Hollingsworth also testified that the shooter was wearing a darker jacket, like the one worn by Petitioner, and that he could not have confused Petitioner with the man with the Carhartt jacket since they looked different, the man in the Carhartt jacket had a lighter complexion, a lighter jacket, longer hair and more facial hair than Petitioner.  Tr. 299.  The police subsequently showed Hollingsworth a photographic lineup and he identified the picture of Petitioner as the shooter, with 100 percent certainty.  Tr. 310-311.

De-Andre Hill ("Hill") testified that on February 2, 2004, he was driving a Red Doge Neon with a friend he only knew as "Lo", when they spoke with Petitioner, who he knew from school.  Tr. 778-80, 808.  He also testified that he was wearing a dark black Carhartt jacket on this date.  Tr. 803, 805.  Hill stated that Petitioner wanted to get some cocaine for some "friends".  Tr. 780-81.  According to Hill, they met up with two other people in the late afternoon who were following them in a separate vehicle.  Tr. 781-82.  Hill stated that they stopped in several places because they were having trouble finding drugs, and that each time Petitioner and Lo would go into these places to obtain cocaine.  Tr. 782-83.  After some cocaine was found, a man (Braziel) got into his vehicle at a Super USA store, and after they started driving, Braziel tried to call off the deal because the drugs were "short."  Tr. 784-85.  Hill testified that they drove off in order to avoid having the police or others see the transaction.  Tr. 786.

---

[7]     Minneapolis Police Officer Rebecca Lane testified that Hollingsworth told her that he did not see a gun.  Tr. 523-24.  Hollingsworth also told Sergeant Darcy Klund ("Sergeant Klund") that he saw black gun, while at the same time telling her that he did not a get a look at the gun.  Tr. 581.

According to Hill, Braziel was arguing with Petitioner about the drugs being short, a verbal and physical fight took place between Petitioner and Braziel, and that at some point, Hill stopped the vehicle and told them to get out. Tr. 786-87, 839, 845. Petitioner got out of the vehicle and Braziel crawled from the back seat over to the front to get out because the child safety lock was on. Tr. 788. Braziel exited the vehicle. Tr. 822-23. Hill testified that he drove off and heard shots fired as he got down the street, although he later testified that he was not sure whether shots were fired while he was still parked. Tr. 789-90, 825. Hill stated that he did not see any gun. Tr. 827.

Amy Logering ("Logering") testified at trial that on February 2, 2004, she was in front of her residence shoveling snow when she heard shouting between individuals in two vehicles on the street. Tr. 427-28, 439. Logering stated that she observed one individual standing outside of the front passenger door of one of the vehicles wearing a stocking cap and wearing a "dark coat, kind of a bulky, dark coat" with a little bit of "sheen." Tr. 431, 433. Logering observed the arm of this individual go rigid in a downward motion in front of him at about a 45 degree angle and then she saw flashes from the gun at something close to the shooter. Tr. 432, 434. She also testified she heard five or six shots fired from a gun. Tr. 432, 441. Logering stated that she did not get a good enough look at the shooter to make an identification. Tr. 432-33. Logering noted that it was dark out (approximately 6:00 p.m.), but that the area was "[m]oderatly well lit", given the street light and the fact that the trees did not have their leaves. Tr. 433, 437. Logering testified that she did not see a gun. Tr. 446.

Sergeant Tammy Diedrich ("Sergeant Diedrich") with the Minneapolis Police Department testified that on February 2, 2004, she was called regarding a shooting at

the 3800 block of Emerson with a victim present at the scene.  Tr. 531-34.  Sergeant Diedrich testified that no bullet casings were recovered.  Tr. 548-49.  Sergeant Rodney Timmerman ("Sergeant Timmerman") with the Minneapolis Police Department Crime Lab testified that he used a metal detector to find shell casings to no avail and also had police officers look for casings on their hands and knees.  Tr. 615.  Sergeant Diedrich was surprised that no casings were found, however, she stated that it was possible given the arrival of law enforcement vehicles, the ambulance and the snow.  Tr. 551, 554.  Further, Sergeant Diedrich testified that she did not now what happened in the area before she arrived.  Tr. 552.  Sergeant Timmerman testified that finding no casings was not unusual given the snow, the possibility that the shell casings were accidentally moved around by vehicles or personnel, and that the casings could have landed in clothing or in the suspect vehicle that left.  Tr. 615-616, 634, 636.  Sergeant Timmerman also stated that it is difficult to find casings in the snow on city streets, where there is interference from garbage debris, underground pipes and manhole covers.  Tr. 642.

Sergeant Klund testified that Hollingsworth stated that calls were received from the shooter, and that police took possession of Braziel's cell phone.  Tr. 565-66. Officer Klund testified that the last number received on Braziel's cell phone was from 612-270-XXXX.  Tr. 566. Braziel's girlfriend, Krisa Gale ("Gale") provided Minneapolis Police Sergeant Patrick King a piece of paper with the address of 3117 15th Avenue on it and another piece of paper that had written on it the telephone number of 270-XXXX.  Tr. 260-63, 906.[8]  Sergeant Klund determined that the 270-XXXX number was a Verizon

---

[8]     A rental agreement and certificate of housing income, with Petitioner's name on it, found at the 15th Avenue apartment, had the same address as the address that Braziel was trying to get to on February 2, 2004.  Tr. 260-62, 773-74.

telephone number. Tr. 567. An administrative subpoena to Verizon indicated that the phone was listed to an Erick Larkins at a Minneapolis address. Tr. 569. Larkins testified that he had a Byron Davis purchase him a cell phone in 2002, and that in the process gave Davis his address, social security number, date of birth and place of employment. Tr. 752-53. Davis testified that he had leased a phone to a "Reggie" under the name of Larkins, and identified Petitioner during the trial as the individual to whom he had re-leased the telephone. Tr. 880-83. In addition, Davis testified that he saw Petitioner on February 2, 2004 wearing a black puffy jacket and a black stocking cap. Tr. 884. Davis testified that Petitioner called him on February 4 or 5, 2004, asking that his cell phone number be changed. Tr. 885, 888.

Officer Eric Nelson with the Minneapolis Police Department testified that on February 12, 2004, he went to a Lancaster Avenue apartment in Plymouth, Minnesota in order to locate Petitioner as a suspect in the murder of Braziel. Tr. 665-66. There were approximately 5-6 males. Tr. 667. One of the males was Petitioner, who they took into custody. Id. Officer Jeffery Waite with the Minneapolis Police Department testified that his search of the Lancaster Avenue Apartment yielded a semiautomatic 9 millimeter black Ruger handgun. Tr. 596-98.

Dr. Michael Baker with the Hennepin County Medical Examiner's Office opined that the "cause" of Braziel's death was "multiple gun shot wounds" and that the "manner" of his death was "homicide." Tr. 691.

Dana Kloss ("Kloss"), a forensic scientist with the Minneapolis Police Department, testified that she examined the recovered 9 millimeter black Ruger handgun and a bullet received from the Medical Examiner's Office. Tr. 707, 712-13.

Kloss opined that based on her comparison of the bullet she received from the Medical Examiner's Office and the test fires from the seized Ruger, that the bullet from the Medical Examiner's Office was fired from the Ruger. Tr. 717. No fingerprints were obtained from the Ruger; however, prints are usually only recovered on 5-10 percent of firearms. Tr. 852-53.

Viewing the evidence in the light most favorable to the prosecution, this Court finds that a rational trier of fact could have concluded beyond a reasonable doubt that Petitioner intended to cause the death of Braziel while committing or attempting to commit the unlawful sale of a controlled substance. Hollingsworth testified that he and Braziel came to Twin Cities to purchase powder cocaine. Hollingsworth also stated that Braziel made call on his cell phone to ask where to meet the seller. The last number on Braziel's cell phone traced back to a cell phone subleased to Petitioner. Hollingsworth further testified that Petitioner got into their car, and Petitioner set up a purchase of cocaine, and directed them to drive to several locations to find the cocaine. Hollingsworth stated that Petitioner told them that the cocaine would cost $250. DNA recovered from a bottle found in Braziel and Hollingsworth's vehicle belonged to Petitioner, which corroborated the testimony that Petitioner was inside the vehicle. In addition, Hill testified that Petitioner was attempting to sell cocaine to Braziel on February 2, 2004, and a fight ensued between Petitioner and Braziel arising out of the sale.

With regards to whether Petitioner intended to kill Braziel, Hollingsworth testified that he saw Petitioner shoot Braziel six or seven times, and he saw the muzzle flashes. Hollingsworth stated that he could not have confused Petitioner, who was wearing a

38

black "puffy" jacket and a black hat, with the man in the Carhartt jacket since they looked different -- the man in the Carhartt jacket had a lighter complexion, a lighter jacket, longer hair and more facial hair than Petitioner. In addition, Hollingsworth was able to pick Petitioner out of a photographic line up and identify him with 100% certainty that he was the shooter.

Another witness, Logering, testified that on February 2, 2004, she was in front of her residence when she heard fighting and observed one individual, wearing a stocking cap and a "dark coat, kind of a bulky, dark coat" with a little bit of "sheen," standing outside of the front passenger door of a vehicle. She saw the arm of this individual go rigid in a downward motion in front of him at about a 45 degree angle, and then saw flashes from the gun as it fired at something close to him. Davis stated that he saw Petitioner on February 2, 2004, wearing a black puffy coat and a black stocking cap. In addition, the police were able to track Petitioner to the Lancaster Lane address, where a search of the apartment yielded the firearm that the forensic scientist determined to be the weapon that fired a bullet that was found in Braziel. Further, the medical examiner testified that the "cause" of Braziel's death was "multiple gun shot wounds" and that the "manner" of his death was "homicide."

Petitioner's arguments that he could not have been the shooter because no shell casings were found and there was no proof provided that the firearm belonged to him do not lead to a finding that there was insufficient evidence to support his conviction. Witnesses testified that bullet casings would have been difficult to find given that traffic was coming and going, the bullets could have been scattered, it was difficult to find metal casings using a metal detector on a city street covered in snow due to other metal

interference, and the bullets could have been carried away in the suspect vehicle. Further, the eyewitness testimony from Hollingsworth was that he saw Petitioner shoot Braziel, and that Logering testified she saw a person, matching Petitioner's clothing (as corroborated by Hollingsworth and Davis), point at something and then saw gun flashes coming from that person. In addition, the weapon that was used in the murder was found in the residence where Petitioner was arrested.

In any event, even if the evidence allows conflicting inferences, the reviewing court must presume that the jury resolved the conflicts in favor of the state. See Blair-Bey, 44 F.3d at 713 (citing Jackson, 443 U.S. at 326).

Finally, Petitioner's argument that law enforcement failed to pursue a connection with Hill and the murder is not relevant to the sufficiency of evidence issue, as the question before the Court is whether the evidence presented at trial could reasonably support a finding of guilt beyond a reasonable doubt. See Jackson, 443 U.S. at 318-19.

For all of these reasons, the Minnesota Supreme Court's conclusion that the evidence was legally sufficient to sustain Petitioner's conviction is not an unreasonable determination of the facts based on the evidence as a whole. See 28 U.S.C. § 2254(d)(2). Accordingly, Petitioner's claim for relief should be rejected and Ground Nine of the Petition be dismissed.

### H.    Ground Twelve: Prosecutorial Misconduct

In Petitioner's twelfth ground, he asserted that the prosecutor committed misconduct by stating her personal opinion during closing arguments in order to bolster the credibility of state witnesses. See Petition at p. 18. In particular, Petitioner argued that the prosecutor impermissibly vouched for the credibility of Hollingsworth, Logering

and unnamed police officers.  See Petitioner's Reply at pp. 19-21 (citing Tr. 1080, 1081, 1083, 1084, 1089, 1090); see also Petition at p. 18 (citing Tr. 1097-81, 1083-84, 1089-90).  The Minnesota Supreme Court stated the following:

> Finally, Gail argues that the state's argument that Hollingsworth was "a believable person" and was "frank and sincere" constitutes impermissible vouching for a witness. Vouching occurs "when the government implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to a witness's credibility." State v. Lopez-Rios, 669 N.W.2d 603, 614 (Minn. 2003) (internal quotation marks omitted). "But the state may argue that particular witnesses were or were not credible." Id. The state was merely arguing that Hollingsworth was credible, and therefore we hold that the state did not commit misconduct.

Gail, 713 N.W.2d at 866.  In State v. Lopez-Rios, the Minnesota Supreme Court concluded that while the prosecution cannot imply a guarantee of a witness's truthfulness, by referring to facts outside the record, or expressing a personal opinion as to a witness's credibility, the prosecution could argue that particular witnesses were or were not credible.  669 N.W.2d at 614.

Prosecutorial misconduct occurs when a prosecutor vouches for the credibility of a witness. United States v. Young, 470 U.S. 1, 18-19 (1985); Lawn v. United States, 355 U.S. 339, 359-60 n. 15 (1958).  "Improper vouching may occur when the government: (1) refers to facts outside the record or implies that the veracity of a witness is supported by outside facts that are unavailable to the jury; (2) implies a guarantee of truthfulness; or (3) expresses a personal opinion about the credibility of a witness."  United States v. Santana, 150 F.3d 860, 863 (8th Cir. 1998) (citing United States v. Beasley, 102 F.3d 1440, 1449 (8th Cir.), cert. denied, 520 U.S. 1246 (1997)); see also United States v. Mullins, 446 F.3d 750, 760 (8th Cir. 2006), cert. denied, 549

U.S. 923 (2006) ("Improper vouching occurs when a prosecutor refers to facts outside the record, implies that a witness's testimony is supported by facts not available to the jury, gives an implied guarantee of truthfulness, or expresses a personal opinion regarding witness credibility.") (citation omitted).

As to Hollingsworth, the statements by the prosecutor were as follows:

> Mr. Hollingsworth, an eye-witness, a person who can identify this man as the person who did the shooting. And you should look at his credibility. Certainly hold him to the same standard that you would anyone else.

> Three or four things I would like you to focus on. One of those is the manner in which he testified. Mr. Hollingsworth was not trying to be evasive with anybody, and in fact, even during very vigorous cross-examination Mr. Hollingsworth was trying to be helpful. He didn't want to speculate about things he wasn't suppose to. He didn't want to make anything up; he wanted to tell what it was he knew, and when told that he hadn't done something that he earlier had said he done, <u>he was very honest and forthright</u> about saying, yeah, you are right, you must be right, I didn't do it that way.

> <u>So you can tell by his manner, his demeanor on the stand,</u> <u>that Mr. Hollingsworth is a believable person</u>. He was also <u>frank and sincere</u>. He admitted he's been convicted of some felonies in the past; he was convicted of false information to the police in the past.

> He told you at one point he didn't really want to get involved in this case. He may not have told everything right away, but then he said he thought about it and he really wanted to get his life together, he was trying to change, and this may be his opportunity to change his life and move on; to do what he thought to be the right thing.

> <u>He was frank and sincere</u> in admitting that he lied about the type of drug they came down here -- or rather, Mr. Braziel came down here for. He admitted that that he wasn't honest and forthright at first, but he did admit that it that it was cocaine they came here for. And he was very consistent.

42

Tr. 1079-81 (emphasis added).

While some of the comments of the prosecutor regarding Hollingsworth such as, "he was very honest and forthright," that Hollingsworth was a "believable person," and that he was "frank and sincere" on their face may appear to be a form of vouching of witness credibility, when taken into context with the surrounding argument by the prosecutor they are not improper.

The prosecutor's statements that Hollingsworth "was very honest and forthright" and "frank and sincere" were in the context of Hollingsworth being confronted during cross-examination that he had not been honest at first. Indeed, Hollingsworth admitted on cross-examination that he had initially lied to the police about only coming down to purchase marijuana, as opposed to also seeking to purchase cocaine. Tr. 332-337. Further, Hollingsworth also admitted to not telling police about the tattoo on Petitioner's back even though he had earlier told the jury that he remembered that Petitioner had a tattoo. Tr. 342. The "very honest and forthright" and "frank and sincere" remarks were not a sweeping assurance by the prosecutor about Hollingsworth's credibility and did not imply that the government possessed knowledge concerning facts not in evidence. To the contrary, these statements were made to remind the jury why Hollingsworth was credible because he did not try to conceal that fact that he had not been forthright with the police. See United States v. Bentley, 561 F.3d 803, 813 (8th Cir.), cert. denied, 130 S.Ct. 175 (2009) ("The government may also explain why the jury might find the government's witnesses credible.") (citation omitted); see also United States v. Two Elk, 536 F.3d 890, 909 n.16 (8th Cir. 2008) (quoting United States v. Rivas, 493 F.3d 131, 137 (3d Cir.), cert. denied 128 S.Ct. 929 (2008)) (""[A] prosecutor may urge that a

witness is trustworthy by arguing from record evidence; vouching occurs only where the prosecutor implicitly refers to information outside the record.'"); United States v. Littrell, 439 F.3d 875, 882 (8th Cir.), cert. denied, 549 U.S. 939 (2006) (finding no improper vouching on a witness's credibility where the prosecutor's comments were made as part of the review of the evidence before the jury); United States v. Jackson, 915 F.2d 359, 361 (8th Cir. 1990) (quoting United States v. Dawkins, 562 F.2d 567, 569 (8th Cir. 1977)) (finding that the prosecutor's statement that a witness was telling the "truth" was not vouching as the "comments derived solely from a comparison of the evidence before the jury. Such a comparison is not improper as it 'neither puts the prosecutor's own credibility before the jury nor does it carry any inference of outside knowledge.'") (citation omitted).

Similarly, regarding the prosecutor's statement to the jury that they could tell by "his manner, his demeanor on the stand, that Mr. Hollingsworth is a believable person," the prosecutor was not referring to something she knew that the jury did not. See Bentley, 561 F.3d at 813 ("The government may not make sweeping assurances about the veracity of its witnesses that suggest to the jury that the government may know something that the jury does not.") (marks and citation omitted). The comments were based on Hollingsworth's demeanor, which the jury could see for themselves. Id. (finding that a prosecutor may comment on the manner of a witness while testifying and may explain why a jury might find a witness believable) (citations omitted). In other words, the comments were based on the evidence in the record and therefore do not constitute improper vouching.

As to witness Logering, the alleged vouching by the prosecutor was as follows:

Let's look at the witnesses, Amy Logering. Here is a woman
who has no connection to anybody. She's a paralegal in a
law firm, she happens to live in North Minneapolis.

* * *

What does she get out of having that story? Does she know
Andre Hollingsworth? No. It's remarkably similar to what Mr.
Hollingsworth told you, because what Mr. Hollingsworth told
you is the truth. Ms. Logering told you what happened and
it's the truth.

Tr. 1083-84 (emphasis added).

The prosecutor stated that both Hollingsworth and Logering were telling the jury

"the truth." The context of the statements demonstrates that they do not constitute

improper vouching. The prosecutor first provided the jury with Logering's background to

this case—that she had no connection to the participants, that she worked for a law firm

and just happened to be living near the location where the crime took place. Nothing

prohibits the prosecutor from making inferences taken from the evidence to show that a

witness is credible. See Littrell, 439 F.3d at 882 (quoting United States v. Eley, 723

F.2d 1522, 1526 (11th Cir. 1984), United States v. Bright, 630 F.2d 804, 824 (5th Cir.

1980)). ("While a prosecutor may not vouch for the credibility of witnesses based on

facts personally known to the prosecutor but not introduced at trial, 'that does not mean

the prosecutor cannot argue that the fair inference from the facts presented is that a

witness had no reason to lie.'"). Here, the inference was that Logering was a member

of the legal community and had no connection to the participants -- thus she had no

reason to lie. The extension of this inference by the prosecutor was that because

Logering had no reason to lie, and her story corroborated Hollingsworth's testimony,

that meant that he too was truthful. The prosecutor in this case did not personally

45

vouch for the truthfulness of the Logering, nor was there any intimation of information outside the scope of the trial. Instead, the credibility arguments were based on the inferences taken from the evidence in the record. See United States v. Grey Bear, 883 F.2d 1382, 1392 (8th Cir. 1989), cert. denied, 493 U.S. 1047 (1990) ("Indeed, prosecutors, as well as defense lawyers, may and must argue as to the credibility of witnesses, and in a case of this kind the issue of credibility is critical. The very nature of closing argument requires a detailed analysis of the testimony of each witness and the inferences to be drawn from the evidence.").

With regards to vouching on behalf of the police involved in the investigation, the challenged argument by the prosecutor was as follows:

> Maybe the defense is going to tell you the police did a terrible job. Mistakes are made. Almost everyone of you wrote in your jury questionnaire, police officers are human, and to be a human is to make a mistakes. Sometimes things get entered into the computer wrong, sometimes they get entered in out of order, but I have to ask you, what more would you expect the police to do in this case.
>
> They interviewed witnesses, people at the scene, they checked cell phone records to track the person who had killed this man, they went to get videotapes from stores and businesses that were involved, they put together four photographic lineups trying to identify who had done this, they took numerous fingerprints from the victim's car and the items in it, from Cheetos bag, they tried to get fingerprints from other things and they weren't able to do it. They tried to get fingerprints from the gun and weren't able to do it, they got search warrants to look for evidence, they did DNA testing, they processed the scene with a metal detector and even got down on their hands and knees to dig for shell casings.
>
> What more would you expect the police to do in a case like this? It's not perfect, nothing ever is, but they did their investigation, and they completed it properly and found the right person, the person who killed Mr. Braziel.

46

Tr. 1089-90 (emphasis added).

First, this Court does not find that the prosecutor was referring to the credibility of the testimony elicited from the law enforcement officers. At most, these statements by the prosecution pertained to the how the police's investigation of the case was handled. In any event, to the extent that the prosecutor argued that law enforcement completed the investigation "properly", it did not constitute improper vouching as it was made after she listed the methods, in evidence, used in conducting the investigation. See Littrell, 439 F.3d at 882 ("A careful review of the transcript of the closing arguments convinces us the comments were made as part of the prosecutor's review of the evidence before the jury. The prosecutor's comments about Investigator Kile being meticulous were made during his recitation of the evidence showing the investigator's methods in conducting an investigation.") (internal citation omitted).

In sum, the Court concludes that state courts' resolution of Petitioner's vouching claim was not contrary to, nor did it involve an unreasonable application of, the decisions of the United States Supreme Court. As such, Ground 12 of the Petition should be dismissed.

## I.    Request for a Hearing

Petitioner made a conclusory request for an evidentiary hearing at the end of his memorandum in support of his Petition. See Petitioner's Reply. at p. 26. Petitioner also asked for an evidentiary hearing to rebut facts made by witnesses and an evidentiary hearing "to determine the facts" as it related to his challenge of the sufficiency of the evidence. Id. at pp. 12, 18.

Section 2254(e)(2) provides:

> [i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
>
> (A) the claim relies on-
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254

The Court cannot hold an evidentiary hearing unless Petitioner has made the requisite showing under 28 U.S.C. § 2254(e)(2)(A) and (B). Petitioner's conclusory requests for an evidentiary hearing did not suffice. For this reason, the Court denies Petitioner's request for a hearing

## III. RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

1.   Reginald Lee Gail's Petition for Habeas Corpus by a Person in State Custody [Docket No. 1] be **DISMISSED WITH PREJUDICE**.

2.   Reginald Lee Gail's Motion to Have Civil No. 08-404 Chronology Reported [Docket No. 27] be **DENIED** as moot.

Dated:        January 20, 2010

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 8, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this Rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.